## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **BRETON PETERSEN,** | ) | **CASE NO. 1:08 CV 01217** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE SOLOMON OLIVER** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE CLEVELAND INSTITUTE OF ART,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT WITH REGARD TO THE AMENDED COMPLAINT
## FILED BY PLAINTIFF BRETON PETERSEN

---

Pursuant to Fed.R.Civ. P. 56, Defendant The Cleveland Institute of Art, respectfully moves the Court for an order granting summary judgment on each claim contained in Plaintiff's Amended Complaint on the grounds that there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.

A Memorandum in Support of this Motion and an Appendix of exhibits are attached and incorporated herein.

Respectfully submitted,

*/s/ Lisa M. Jones* _____

T. Merritt Bumpass, Jr. (0015189)
mbumpass@frantzward.com
Rebecca J. Bennett (0069566)
rbennett@frantzward.com
Lisa M. Jones (0082426)
ljones@frantzward.com
FRANTZ WARD LLP
2500 Key Center, 127 Public Square
Cleveland, Ohio 44114-1230
(216) 515-1660 (Phone) ● (216) 515-1650 (Fax)

Attorneys for Defendant The Cleveland Institute of Art

## CERTIFICATE OF SERVICE

A copy of the foregoing Motion for Summary Judgment was filed electronically this 30th day of April, 2009.  All parties will be served by operation of the Court's electronic filing system.

*/s/ Lisa M. Jones* _____
One of the Attorneys for Defendant

ii

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF MATERIAL FACTS .......................................................... 1

A.      The Cleveland Institute of Art .................................................................. 1
B.      Technical Assistant Position...................................................................... 2
C.      Petersen's Employment as a Technical Assistant...................................... 2
        1.      *The 2005-2006 Academic Year* ................................................... 3

        2.      *The 2006-2007 Academic Year* ................................................... 5

        3.      *The 2007-2008 Academic Year* ................................................... 8

III.    LAW AND ARGUMENT.................................................................................. 9

A.      PETERSEN IS EXEMPT UNDER THE ADMINISTRATIVE EXEMPTION. ................... 10
        1.      *Petersen was compensated in excess of $455 per week.*.................. 10

        2.      *Petersen's duties were directly related to CIA's management or general business operations.*........................................................................................... 11

        3.      *Petersen exercised discretion and independent judgment.*.............. 13

B.      PETERSEN IS EXEMPT UNDER THE EXECUTIVE EXEMPTION.............................. 15
        1.      *Petersen's primary duty was management of the computer labs.*..... 16

        2.      *Petersen supervised and directed the work of multiple work-study students.*................ 17

        3.      *Petersen had the authority to hire work-study students.* ................. 18

C.      PETERSEN'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW...................... 18
        1.      *Petersen was an at-will employee.* ................................................. 18

        2.      *CIA did not breach the alleged contracts' terms.* ........................... 20

IV.     CONCLUSION................................................................................................. 20

iii

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Ali v. Chelsea Catering*, 1997 U.S. App. LEXIS 4037 (6th Cir. Feb. 28, 1997) ...................................... 19

*Beauchamp v. Flex-N-Gate*, 357 F. Supp.2d 1010 (E.D. Mich. 2005) .................................................. 9, 16

*Condren v. Sovereign Chem. Co.*, 1998 U.S. App. LEXIS 7071 (6th Cir. April 3, 1998 .............. 13, 14, 15

*Delay v. Rosenthal Collins Group*, No. 2:-07-cv-568, 2008 U.S. Dist. LEXIS 42032
(S.D. Ohio May 27, 2008) ..................................................................................................... 20

*Douglas v. Argo-Tech Corp.*, 113 F.3d 67 (6th Cir. 1997) ........................................................................ 9

*Henkel v. Educational Research Council of America* (1976), 45 Ohio St.2d 249 ................................... 19

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986) ...................................................................... 9

*Koppinger v. American Interiors, Inc.*, 295 F. Supp.2d 797 (N.D. Ohio 2003) ................................. 11, 13

*Lacourse v. GRS III, LLC*, 2006 U.S. Dist. LEXIS 899355 (E.D. Mich. Dec. 13, 2006) ................... 14, 15

*Lott v. Oriana House*, No. 3:07-cv-1084, 2008 U.S. Dist. LEXIS 64383 (N.D. Ohio Aug. 19, 2008) ...... 19

*Lutz v. Ameritech Corp.*, No. 98-2367, 2000 U.S. App. LEXIS 3218 (6th Cir., Feb. 23, 2000) ......... 12, 13

*Moore v. Fairfield County Sheriff's Dep't*, No. C-2-02-748, 2004 U.S. Dist. LEXIS 27633
(S.D. Ohio Jan. 6, 2004). ..................................................................................................... 19

*Sibley v. Alcan, Inc.*, No. 1:05-cv-0550, 2007 U.S. Dist. LEXIS 2293222 (N.D. Ohio Mar. 29, 2007) .... 20

*Stone v. Jo-Ann Stores, Inc.*, 109 F. Supp.2d 752 (N.D. Ohio 2000) ...................................................... 19

*Taylor v. St. Vincent's Med. Ctr.*, No. 97-3236, 1998 U.S. App. LEXIS 7991 (6th Cir. Apr. 22, 1998)... 19

*Thomas v. Speedway SuperAmerica*, 506 F.3d 496 (6th Cir. 2007) ......................................................... 9

*Whisman v. Ford Motor Co.*, 157 Fed. Appx. 792 (6th Cir. 2005). ......................................................... 10

### Statutes

29 C.F.R. § 541.100(a) ......................................................................................................................... 16, 17

29 C.F.R. § 541.102 ............................................................................................................................. 16, 17

29 C.F.R. § 541.200 ................................................................................................................................... 10

29 C.F.R. § 541.201(a) ............................................................................................................................... 11

29 C.F.R. § 541.201(c) ............................................................................................................................... 11

29 C.F.R. § 541.202(a) ............................................................................................................................... 13

29 C.F.R. § 541.202(c) ............................................................................................................................... 13

29 U.S.C. § 207(a)(1) ............................................................................................................................. 9, 14

Fed R.Civ. P. 56 ............................................................................................................................................ i

Ohio Revised Code § 4111.01 *et seq.*............................................................................................. 1, 9

Ohio Revised Code § 4111.03 ............................................................................................. 15, 18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO - EASTERN DIVISION**

| | | |
|---|---|---|
| **BRETON PETERSEN,** | ) | **CASE NO. 1:08 CV 01217** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE SOLOMON OLIVER** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE CLEVELAND INSTITUTE OF ART,** | ) | **DEFENDANT'S MEMORANDUM** |
| | ) | **IN SUPPORT OF ITS MOTION** |
| **Defendant.** | ) | **FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiff Breton Petersen ("Petersen") cannot succeed on his overtime claim against The Cleveland Institute of Art ("CIA") because the evidence, including his own testimony, reveals that he is exempt from overtime under the Fair Labor Standards Act ("FLSA") and Ohio Revised Code § 4111.01 *et seq.*   The key to this determination is an analysis of Petersen's actual job duties as a Technical Assistant at CIA.

Petersen's breach of employment contract claim likewise fails.  First, he cannot show that his offer letters created enforceable employment contracts.  Second, the undisputed evidence shows no breach.

Because Petersen cannot establish any genuine issue of material fact with regard to his claims, CIA is entitled to summary judgment as a matter of law.

## II.      STATEMENT OF MATERIAL FACTS

### A.   The Cleveland Institute of Art

The Cleveland Institute of Art ("CIA") is a premier professional college of art and design located in Cleveland's University Circle area.  (Hollern Dep. 7).[1]   A non-profit, private institution, CIA's mission is to make substantive contributions to our community through

---

[1] Excerpts from the deposition transcript of Matthew Hollern are attached as Exhibit A.

research, education and the practice of art and design.  (*Id.* at 8).  CIA's areas of study are currently divided into six "environments", and most of the environments are divided into two or more departments.  (Affidavit of Almut Zvosec, ¶ 4).[2]

**B.  Technical Assistant Position**

Every year, CIA employs a number of individuals in positions known as technical assistants, and referred to for short as "TAs."  CIA hires TAs according to their experience and technical skill.  (*See* Hollern Dep. 104).  CIA looks for individuals who have experience with the types of equipment and devices CIA utilizes in each of its environments.  (*Id.* at 104).

There is regular and rapid turnover in the TA position, due to the nature of the position.  (Zvosec Aff. at ¶ 9).  It is often a stepping-stone position for graduate students in their art career paths.  Many students work as a TA after completing an undergraduate degree, and before applying to graduate school.  A benefit for all TAs is access and use of CIA's resources, facilities, equipment and computers and software to create portfolios for applying to graduate school.  (*Id.*)

**C.  Petersen's Employment as a Technical Assistant**

Petersen worked as a TA at CIA for three full academic years beginning with the 2005-2006 academic year.  (P. Dep. 38-39).[3]  His job duties and level of responsibility increased in the middle of the second academic year when he took on additional responsibilities.  (P. Dep. 39).  Each year he received a written offer letter outlining his rate of pay, the total number of hours he would work, and the time period for which he would be paid.  (P. Dep. Exs. B,C,F,G).  Much like teachers' salaries, Petersen's pay was stretched out for a full year even though he did not work during the summer or on breaks.  (P. Dep. 46, 253).  Like other salaried employees,

---

[2] The Affidavit of Almut Zvosec is attached hereto as Exhibit B.
[3]  Excerpts from the deposition transcript of Plaintiff Breton Peterson (P. Dep.) are attached as Exhibit C.

Petersen received health care benefits.  (P. Dep. 46).  The offer letters did not contain any other terms or conditions typical to an employment contract, such as term of employment, scope or description of duties, or the manner in which employment could be terminated.  (P. Dep. 42, 71-72; P. Dep. Exs. B,C, F,G).

Petersen recalled receiving at least two versions of CIA's Employee Handbook during his employment.  (P. Dep. 192-93, 198).  Each handbook specifically stated that Petersen's employment with CIA was "at will."  (P. Dep. Ex. I at D0006; P. Dep. Ex. K at 309).  Petersen also signed an acknowledgment that indicated that his employment with CIA was "at will."  (P. Dep. Ex. J).

### 1.   The 2005-2006 Academic Year

Petersen began working for CIA as a TA in the communication design department[4] ("CD department") for the 2005-2006 academic year in August 2005.  (P. Dep. 43; P. Dep. Ex. B). Petersen was paid a salary of $18,100.00. (P. Dep. Ex. B).  Petersen's work hours were 30 hours per week for a period of 37 weeks.  (Id.).  Petersen's offer letter provided that the salary period ran from August 16, 2005 until June 30, 2006.  (Id.).  Petersen did not begin work at CIA, however, until August 22, 2005.  (P. Dep. 43).  Similarly, Petersen did not work at CIA through June 30, 2006.  (Id.). CIA never deducted any absences from Petersen's pay.  (See P. Dep. 239). Indeed, CIA paid Petersen through June 30, 2006, despite the fact that he did not work the entire period.  (P. Dep. 46).  The offer letter did not provide for extra payments for working hours in excess of those specified in the letter.  (P. Dep. Ex. B).

Mari Hulick, chair of the CD department and Petersen's supervisor, requested that Petersen work on Monday through Wednesday from 9:00 a.m. to 5:00 p.m.  (P. Dep. 180).

---

[4] The CD department was previously referred to as the graphic design department.  (P. Dep. 35, 45).

3

Petersen was asked to work a shorter day on Thursday due to the 30 hour requirement in offer

letters.  (*Id.*).  Petersen was not required, however, to rigidly adhere to this schedule.

> Q:  Okay.  Did you work until 5:00 every day of the school year?
> A:  No.
>
> Q:  Were there some days that you worked later than 5:00?
> A:  Yes.
>
> Q:  Were there some days where you left earlier than 5:00?
> A:  Yes.
> …
>
> Q:  Did you in fact start every day during that school year at 9:00?
> A:  No.
>
> Q:  Were there some days where you arrived early?
> A:  Yes.
>
> Q:  Were there some days where you arrived late?
> A:  Yes.

(P. Dep. 180-81).  CIA never disciplined Petersen for failing to arrive to work at 9:00 a.m. or

failing to remain at work until 5:00 p.m. (P. Dep. 181).  Likewise, CIA did not deduct partial day

absences from Petersen's pay.  (P. Dep. 239).

As a TA in the CD department, Petersen was required to manage the department's

computer lab.  (P. Dep. 36).  Petersen suggested revisions to the computer lab rules and was

responsible for revising them.  (P. Dep. 165).  In addition, Petersen was responsible for resolving

problems in the lab.  (*See* P. Dep. 98-99, 120, 123).  Petersen's responsibilities included

overseeing and tracking the departmental expenditures as well as making recommendations

concerning large purchases and software use.  (P. Dep. 149-50, 171; P. Dep. Ex. H).  Petersen

was required to assist students and faculty with printing on CIA's large format printers, also

known as plotters.  (P. Dep. 94-95).  These printers produced documents that could be as long as

20 feet and 42 inches wide.  (P. Dep. 95).  Petersen also had to troubleshoot printing problems,

including diagnosing and fixing software errors and reformatting files.  (P. Dep. 97-99, 100).

Perhaps the best summary of Petersen's job duties is his own words.  Specifically, Petersen's resume indicates that he was responsible for the following tasks as a TA in the CD department:

- Assembling, upgrading, and administering the department computer lab;

- Operating and maintaining the department plotter;

- Assisting students and faculty with the use of software and hardware;

- Creating, editing, and formatting department videos, posters, and databases;

- Overseeing many department purchases and assisting with capital requests;

- Directing work-study students, including prioritizing and delegate their work; and

- Coordinating with faculty to organize exhibitions, shows, and other events.

(P. Dep. Ex. H).

Petersen admits that he was given virtually no instruction as to how to complete the tasks required for his job.  (P. Dep. 37-38).  Indeed, Petersen testified that he relied on his previous work experience and independent research to perform the duties of his job.  (*Id.*).

### 2. *The 2006-2007 Academic Year*

Petersen continued as a TA for the CD department during the 2006-2007 academic year.  (P. Dep. 39).  Petersen was paid a salary of $18,100.00. (P. Dep. Ex. C).  Petersen's work hours were 30 hours per week for a period of 37 weeks.  (*Id.*).  His offer letter provided that the salary period ran from July 1, 2006 until June 30, 2007.  (*Id.*).  Again, CIA paid Petersen for the entire salary period, but he did not begin working until August 2006.  (P. Dep. 47-48).  The offer letter did not provide for extra payments for working overtime.  (P. Dep. Ex. C).

In October 2006, there was an opening for a TA position in the industrial design ("ID")

5

department.  Petersen suggested that he could fill this opening and continue to perform his duties in CD.  (P. Dep. 60, 62; *see also,* CIA's Response to Plaintiff's Request for Production, at D 0121, relevant portions attached as Defendant's Exhibit D).  He convinced the department chairs that he possessed the skills necessary to manage the computer labs in both departments, and that he could accomplish both workloads in 40 hours per week.  The department heads agreed, and CIA gave Petersen a revised pay agreement for the school year to include payment for his additional responsibilities, including a stipend.  (P. Dep. 59, 64, P. Dep. Exs. E, F).  Petersen's salary for the new combined position was increased to $18,200.00 for the balance of the school year.  (P. Dep. Ex. F).  Petersen's work hours were 40 hours per week for a period of 26 weeks, and the new salary period ran from January 31, 2007 until June 30, 2007.  (*Id.*).  Dan Cuffaro served as Petersen's supervisor for the ID department, and Hulick remained his supervisor for CD.  (*Id.*).  In order to accommodate both departments, Petersen's supervisors asked him to work Monday through Friday from 9:00 a.m. to 5:00 p.m.  (P. Dep. 182-83).  Petersen was not disciplined, however, for failing to strictly adhere to this schedule.  (P. Dep. 181, 183-84).

As a TA for both the CD and ID departments, Petersen took on additional duties.  (P. Dep. 84).  Petersen was responsible for maintaining an additional computer lab and working with the ID computer server.  (P. Dep. 84-85). With respect to the server, Petersen was responsible for ensuring that all students had an account on the server that would enable them to log on to the computers.  (P. Dep. 85).  Petersen was responsible for resolving printer problems in the ID department as well as working with the server in the event that the server crashed.  (P. Dep. 127-28).

Petersen also had added financial responsibility.  In particular, Petersen was responsible for creating and maintaining records to track student printing and the associated costs and fees.

6

(P. Dep. 111-12).  Petersen made a recommendation about adjusting the printing fees for students in the ID department.  (P. Dep. 165-66).  Petersen was responsible for purchasing necessary supplies and materials from vendors.  Petersen also was responsible for deciding when to make supply purchases and in what quantity.  (P. Dep. 148; Ex. D at D 0122).  In addition, Petersen made recommendations with respect to large dollar purchases, which his supervisors relied upon.  (P. Dep. 148, 149-50).

Q:  Did you have any involvement at any time with capital requests?

A:  Sure.  If Dan or Mari wanted to make some sort of big purchase for the department, let's say a projector, that was something I helped Mari with.  She came to me and said, "Look, I want to spend this much money, maybe 2,000 or 3,000, and these are the projectors that I'm considering.  What is your recommendation?"  I might go online and kind of search through message boards by doing Google searches to see what people say about these various projectors and then recommend one to her and she'd go ahead and file the paperwork to make that happen.

Q:  Would she typically go with your recommendation?

A:  Usually[,] I think so.

(P. Dep. 149-50).

Petersen also increased his supervisory responsibilities by overseeing the work-study students in both the ID and CD departments.  Petersen was responsible for setting work schedules and monitoring the hours worked by each ID work-study employee.  (P. Dep. 125).  Petersen was required to complete and verify time cards for each work-study employee, and attest by signature that the employees "performed satisfactorily." (P. Dep. 125; *see also* copies of the ID work-study employees' time sheets that were signed by Petersen, attached as Defendant's Exhibit E.).  Petersen also was responsible for assigning tasks to the ID work-study employees and directing their work on a daily basis.  (P. Dep. 126).  The work-study employees reported directly to Petersen. (Ex. D at D 0114).

7

### 3. The 2007-2008 Academic Year

Petersen continued to serve as TA for the CD and ID departments for the 2007-2008 academic year.  (P. Dep. 39, 70; P. Dep. Ex. G).  CIA paid Petersen a salary of $29,400.00.  (P. Dep. Ex. G).  Petersen's work hours were 40 hours per week for a period of 42 weeks.  (*Id.*).  His offer letter provided that the salary period ran from July 1, 2007 until June 30, 2008.  (*Id.*).  CIA paid Petersen his full salary through June 30, 2008, even though he did not work the entire period.  (P. Dep. 245).  The offer letter did not provide for extra payments for working overtime.  (P. Dep. Ex. G).

In his dual role as TA for both departments, Petersen was responsible for setting up the computer labs at the beginning of the school year.  (P. Dep. 155).  To accomplish this task, Petersen was required to "image" each of the computers in the lab.  (P. Dep. 155-56).  Petersen also was involved in software fixes, in which he was required to identify a problem in a software program, acquire the appropriate software update, and "fix" the problem.  (P. Dep. 157-59).

Petersen did not return to CIA in the TA position for the 2008-2009 academic year.  In the Fall of 2008, Petersen began attending graduate school at the School of the Art Institute of Chicago.  (P. Dep. 14).

### III.    LAW AND ARGUMENT

The FLSA requires covered employers to pay their employees at least one-and-one-half times their regular wage rate for hours the employees work in excess of forty hours in a given work week.  *See* 29 U.S.C. § 207(a)(1).[5]  The statute exempts from this requirement, however, "any employee employed in a bona fide executive, administrative, or professional capacity."  29

---

[5] Ohio has adopted and codified the FLSA's provisions regarding overtime in Ohio Revised Code § 4111.03. Accordingly, Plaintiff's state law claim is subject to the same analysis as his FLSA claim.  *See, e.g.*, *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, n.2 (6th Cir. 1997)(noting that Ohio's wage and hour law "parallels the FLSA" and approaching Ohio law and the FLSA in a "unitary fashion" is appropriate).

U.S.C. § 213(a)(1).  Whether an employee's particular activities exclude him or her from the overtime provisions of the FLSA is a question of law.  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

An individual's job title "alone is insufficient to establish the exempt status of an employee."  *See Beauchamp v. Flex-N-Gate*, 357 F. Supp.2d 1010, 1014 (E.D. Mich. 2005).  Rather, the court must examine the duties actually performed by an employee to determine whether the employee is exempt under the regulations.  *Id.*  The United States Court of Appeals for the Sixth Circuit has stressed that "courts cannot rely upon the plaintiff's or the employer's description of the plaintiff's position or authority; instead [the courts] 'must look at the plaintiff's actual duties' to determine whether he qualifies for an exemption."  *Thomas v. Speedway SuperAmerica*, 506 F.3d 496, 503 (6th Cir. 2007).

Because Petersen qualifies under either the administrative or executive exemption, he is not entitled to overtime wages, and CIA is entitled to summary judgment as a matter of law as to Petersen's federal and state wage and hour claims.  Since Petersen purports to serve as a representative of a class of TAs at CIA, the class claims must likewise be dismissed as a matter of law.

## A.  PETERSEN IS EXEMPT UNDER THE ADMINISTRATIVE EXEMPTION.

The regulations governing the administrative exemption provide a test for determining whether an employee falls under the exemption.  29 C.F.R. § 541.200.  To qualify as an administrative employee under the exemption, three elements must be met:

> (1) The employee must be compensated on a salary or fee basis at a rate not less than $455 per week;
>
> (2) The employee's primary duty must be the performance of office or non-manual work directly related to the management or general operations of the employer or the employer's customers; and

9

(3) The employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.

*See* 29 C.F.R. § 541.200.  CIA can establish all of these elements with respect to Petersen.

### 1. Petersen was compensated in excess of $455 per week.

An employee is "compensated on a salary basis" if he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in quality or quantity of the work performed."  *Whisman v. Ford Motor Co.*, 157 Fed. Appx. 792, 796 (6th Cir. 2005).

Petersen does not dispute that CIA paid him on a salary basis in excess of $455 per week. In 2005, CIA paid Petersen a predetermined salary for a period of 37 weeks ($489.19 per week). (*See* P. Dep. Ex. B.).  Plaintiff's salary remained the same for the 2006-2007 academic year until Petersen's salary was increased when he took on additional duties as a TA for the ID department. (P. Dep. 39).  Then, CIA increased Petersen's salary to $18,200 for a period of 26 weeks ($700 per week).  (*See* P. Dep. Ex. F).  Finally, Petersen's salary for the 2007-2008 academic year was $29,400 for a period of 42 weeks ($700 per week).  (*See* P. Dep. Ex. G).

The amount of Petersen's paycheck was not adjusted based on the number of hours he worked in a given pay period.  (P. Dep. 239).  Likewise, CIA did not dock Petersen's pay for partial day absences.  (P. Dep. 239, 256).

### 2. Petersen's duties were directly related to CIA's management or general business operations.

Job duties are "directly related to management policies or general business operations if they relate to the 'administrative operations' of a business," such as assisting with the running or services of the business, as distinguished from working on a manufacturing production line or

selling a product in a retail or service establishment.  29 C.F.R. § 541.201(a).  An employee also may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers.  29 C.F.R. § 541.201(c).

In *Koppinger v. American Interiors, Inc.*, 295 F. Supp.2d 797 (N.D. Ohio 2003), the court concluded that an employee, who was responsible for maintaining the company's computer system, fell within the administrative exemption.  The employee's duties consisted of ordering replacement parts, recommending purchases of new software and hardware, installing software, and repairing equipment for the company's computer users.  *Id*. at 799.  When users called the employee with computer problems, the employee determined the priority of and when and how to handle those problems.  *Id.*  In reaching its decision that the employee's work was directly related to the employer's general business operations, the court noted that the employee's position involved maintaining, upgrading, and administering the employer's computer system, which was a vital component of the employer's business.  *Id.* at 802.  The court also noted that the employee's position included significant problem-solving, planning and purchasing duties, which were all important to the employer business.  *Id.*[6]

Similarly, in *Lutz v. Ameritech Corp.*, No. 98-2367, 2000 U.S. App. LEXIS 3218 (6th Cir., Feb. 23, 2000), the court found that an employee, who was responsible for providing employees with access to the intra-office computer network, implementing new programs, and solving network problems, fell within the administrative exemption.  *Id.* at *5-*6.  In reaching its conclusion, the court relied on the fact that the employee's duties included analyzing problems and implementing solutions with respect to the employer's computer network.  The court

---

[6] It should be noted that the court in *Koppinger* specifically found this employee to be exempt under the administrative exemption, rather than the computer employee exemption.

determined that these duties were directly related to the employer's general business operations. *Id.* at *6.

Petersen's duties as a TA were directly related to both the management and general business operations of CIA.  First, Petersen's own resume describes his management duties.  (P. Dep. Ex. H).  Petersen states that he was responsible for "administer[ing]" the department computer lab, which included assembling and upgrading equipment and operating and maintaining the department's large format printers.  (*Id.*).  Petersen was responsible for managing a total of 48 computers.  In addition, Petersen was responsible for managing the work-study students.  (P. Dep. 125-26).  Again, Petersen's resume notes that he "direct[ed] work-study students" and prioritized and delegated work to them.  (P. Dep. Ex. H).  All of these duties are directly related to the management of CIA's computer labs for the CD and ID departments.

Second, Petersen's duties were directly related to the general business operations of CIA because he was responsible for ensuring that the computer labs were up and running smoothly on a daily basis.  (P. Dep. 148).  To this end, Petersen explained that he was responsible for setting up the computers, solving network problems, "fixing" software and ensuring that materials and supplies had been ordered when needed and in appropriate quantities.  (P. Dep. 148, 155, 157-59).  The courts in both *Koppinger* and *Lutz* determined that these exact duties satisfied the requirements of the administrative exemption.  Petersen's duties, much like the duties of the employees in *Koppinger* and *Lutz*, were vital to the academic and professional success of both the CIA and its consumers – its students and faculty.  Indeed, if there was a problem with the computers, the printers or the network, regardless of the size of the issues, the students and the faculty turned to Petersen first to resolve them.  (P. Dep.127, 170, 188-89, 318-19).  Even Petersen's own supervisors turned to him as the primary resource for troubleshooting and solving

12

computer lab problems.  (P. Dep. 127, 158-59).  Thus, Petersen's duties were directly related to CIA's general business operations.

### 3.  Petersen exercised discretion and independent judgment.

An employee also must exercise discretion and independent judgment with respect to matters of significance to qualify for the administrative exemption.  29 C.F.R. § 542.202.  The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a); *Condren v. Sovereign Chem. Co.*, 1998 U.S. App. LEXIS 7071 (6th Cir. April 3, 1998).  The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.  29 C.F.R. § 541.202(c). "Matters of significance" refers to the level of importance or consequence of the work performed.  29 C.F.R. § 541.202(a).  Employees can, however, exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. 29 C.F.R. § 541.202(c).

In *Condren*, the court concluded that an employee who routinely compared and evaluated possible courses of conduct satisfied the administrative exemption.  *Condren*, 1998 U.S. App. LEXIS, at *9.  In reaching its conclusion, the court relied on the fact that the employee also had discretion in his duties as a manager of a product account.  *Id.* at *10.  Specifically, the court referred to the fact that the employee had to forecast how much product to order, when to order it, how to ship it and how to pay for it.  *Id.*  The court stated that in making these decisions, the employee was not merely following prescribed procedures or performing clerical duties.  Rather, the employee was required to independently evaluate the needs and make a decision.  *Id.*

13

Similarly, in *Lacourse v. GRS III, LLC*, 2006 U.S. Dist. LEXIS 899355 (E.D. Mich. Dec. 13, 2006), the court concluded that an employee, who used a hands-on approach to figure out how to repair something, was exercising discretion and independent judgment. *Id.* at *55. In reaching its decision, the court noted that the employee admitted to using his own discretion to research whatever materials were needed in order to respond to his employer's needs. *Id.* The court stated that the employee used his "own skill, experience, judgment, and discretion in formulating a repair solution" for his employer. *Id.* at *56.

Petersen, much like the employees in both *Condren* and *Lacourse*, exercised discretion and independent judgment with respect to matters of significance. Petersen admits that he was not given specific instruction as to how to perform his job duties. (P. Dep. 37-38). Petersen admits that he relied on his own knowledge, education, experience, independent research and technical skill to resolve computer problems in the lab. (P. Dep. 37). Indeed, Petersen admits that he would do his own independent research to "fix" software problems or learn how to use equipment. (P. Dep. 38, 158-159). Petersen's reliance on his own skill and research evidences the fact that Petersen exercised independent judgment and discretion in accomplishing his duties. *See Lacourse*, 2006 U.S. Dist. LEXIS, at *55.

In addition, Petersen's duties required him to ensure that the computer labs were appropriately supplied to meet the demands of students and faculty. (P. Dep. 148). To accomplish this task, Petersen was required to forecast what supplies would be needed, how much to order and when the order needed to be placed in order to meet the needs of the lab. Petersen made these determinations by patterns of usage. As previously discussed, Petersen was not given a specific schedule as to when to order supplies. Rather, Petersen had to make a judgment as to these details based on both the immediate and future needs of the students and

faculty.  *See Condren*, 1998 U.S. App. LEXIS, at *10.    Petersen was not required to obtain

approval prior to ordering supplies.  (P. Dep. 148-49).

Finally, Petersen made recommendations regarding large dollar purchases and the

implementation of new systems and computer software solutions.  (P. Dep. 148-50, 171, 271-72)

Petersen's recommendations were typically approved by his supervisors.  (P. Dep. 149-50; Ex.

D. at D 0150-D 0151).

The evidence confirms that Petersen exercised discretion and independent judgment in

carrying out his TA duties, which were necessary in order to allow students and faculty to

complete the academic and professional assignments.    As a result, Petersen satisfies the

requirements to qualify for the administrative exemption.    Accordingly, Petersen is not entitled

to overtime and CIA did not violate the overtime provisions of the FLSA or Ohio Revised Code

§ 4111.03.

**B.  PETERSEN IS EXEMPT UNDER THE EXECUTIVE EXEMPTION.**

The regulations governing the executive exemption also provide a test for determining

whether an employee falls under the exemption.   The executive exemption applies to any

employee who is paid a salary "of not less than $455 per week," and:

> (2) Whose primary duty is management of the enterprise in which the employee is
>     employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other
>     employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions
>     and recommendations as to the hiring, firing, advancement, promotion or any
>     other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).  As discussed previously, it is undisputed that Petersen was paid on a

salary basis.

15

### 1. Petersen's primary duty was management of the computer labs.

The regulations define "management" to include activities such as "interviewing, selecting, and training of employees;…directing the work of employees;…planning work;… determining the type of materials, supplies, machinery, equipment or tools to be used [and] merchandise to be bought…" 29 C.F.R. § 541.102.

In *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp.2d 1010 (E.D. Mich. 2005), the court held that an employee who was responsible for the assignment of duties to employees, estimating the manpower and adjusting work procedures in order to meet production needs, maintaining time records, handling and resolving some work problems, recommending changes in work procedures and production methods, estimating and acquiring materials met the requirements of the management prong of the executive exemption test.  *Id.* at 1015-16.  In reaching its conclusion, the court compared the regulatory definition of "management" duties and the plaintiff's responsibilities and determined that they were "largely coextensive." *Id.* at 1016.

Petersen's job responsibilities match the regulatory definition of "management."  *See* 29 C.F.R. § 541.102.  Petersen's duties included hiring work-study students for the ID department. (P. Dep. 250).  Petersen admits to "directing and planning the work" of the work-study students. (P. Dep. 125-26; P. Dep. Ex. H).  Petersen created and managed the schedules of work study students, and he maintained and monitored their time records, including verifying that they performed their jobs satisfactorily.  (Ex. E).  He addressed and resolved concerns within the computer labs.  (P. Dep. 125).  He routinely recommended changes in procedures to make the labs run more efficiently.  (P. Dep. 165-166).  Finally, Petersen was routinely required to determine which materials needed to be purchased, how often and in what quantity.  (P. Dep. 148).  Each of these duties is specifically listed in the regulations definition of "management."

16

*See* 29 C.F.R. § 541.102.

Moreover, as previously discussed, Petersen was responsible for managing two computer labs that were vital to CIA's CD and ID departments. Petersen states that he was responsible for "administer[ing]" the department computer lab, which included assembling and upgrading equipment and operating and maintaining the department's large format printer. (P. Dep. Ex. H). Thus, Petersen satisfies the management prong of the executive exemption.

### 2. *Petersen supervised and directed the work of multiple work-study students.*

It is undisputed that Petersen supervised two or more employees. Petersen acknowledged that he regularly supervised all of the work-study students in both the CD and ID departments. (P. Dep. 125-126). Indeed, Petersen has indicated that he "direct[ed] work-study students" and "prioritize[d]" and "delegate[d]" work to the work-study students as necessary. (P. Dep. Ex. H). In addition, Petersen was directly responsible for tracking the hours worked by work-study students in the ID department, as well as assigning tasks to those work-study students. (P. Dep. 125-126; *see also* Exhibit D at D 0122). Thus, because Petersen supervised work-study students in both the communications design and ID departments, he satisfies the "two or more" numerical requirement under the regulations. *See* 29 C.F.R. § 541.100(a)(3).

### 3. *Petersen had the authority to hire work-study students.*

Finally, it is undisputed that Petersen had the authority to hire work-study students. Petersen admits that he hired work-study students who applied to work in the ID department. (P. Dep. 249-50). Indeed, Petersen explains that Dan Cuffaro, Environment Chair of Design, gave him authority to hire work-study students. (P. Dep. 249-50). As a result, Petersen satisfies the requirements to qualify for the executive exemption. Accordingly, Petersen is not entitled to overtime and CIA did not violate the overtime provisions of the FLSA or O.R.C. § 4111.03.

17

Because CIA has established that Petersen meets the requirements under the FLSA's administrative and executive exemptions, Petersen is not entitled to overtime and his federal and state wage and hour claims should be dismissed as a matter of law.

## C. PETERSEN'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.

Petersen asserts a breach of contract claim on the grounds that he worked hours in excess of those hours indicated in his offer letters and was not paid for those hours.  (*See* Petersen Dep. 311-12; Amended Complaint ¶¶ 69-72).  Petersen's claim fails for two reasons.  First, since Petersen was an at will employee, his breach of contract claim must fail as a matter of law. Second, even if Petersen's offer letters constituted employment contracts, Petersen cannot establish that CIA breached the contracts' terms.

### 1. *Petersen was an at will employee.*

It is well established that one of the elements a plaintiff must prove to establish a breach of contract claim is "the existence of a contract, which requires an offer, acceptance, and consideration." *Moore v. Fairfield County Sheriff's Dep't*, No. C-2-02-748, 2004 U.S. Dist. LEXIS 27633, at *23 (S.D. Ohio Jan. 6, 2004).  Ohio courts have routinely held that an at will disclaimer in an employee handbook precludes a finding of an employment contract.  *See Ali v. Chelsea Catering*, 1997 U.S. App. LEXIS 4037, at *8-9 (6th Cir. Feb. 28, 1997) (noting that "[a]bsent fraud, at-will disclosures in the job offer and in an employee handbook preclude a finding of an employment contract other than at will"); *Lott v. Oriana House,* No. 3:07-cv-1084, 2008 U.S. Dist. LEXIS 64383, at *15-16 (N.D. Ohio Aug. 19, 2008).

Here, Petersen did not have an employment contract with the CIA.  Each of the Employee Handbooks Petersen received during his employment specifically stated that Petersen's employment with CIA was "at will" under Ohio law.  (P. Dep. Ex. I at p. D0006; P. Dep. Ex. K

18

at p. 309).  In addition, Petersen signed an acknowledgement that the terms of the handbook would not be construed as a contract of employment, and that his employment was that of an employee "at will."  (P. Dep. Ex. J).

Petersen will likely argue that each of his TA offer letters constituted employment contracts. The Ohio Supreme Court has stated that an employment contract which provides for an annual rate of pay, but makes no provision for the duration of employment is terminable at will.  *See Henkel v. Educational Research Council of America* (1976), 45 Ohio St.2d 249 at syllabus. *See also Taylor v. St. Vincent's Med. Ctr.*, No. 97-3236, 1998 U.S. App. LEXIS 7991, *10 (6th Cir. Apr. 22, 1998) (noting that where there is no employment agreement showing employment for a specific term, the employee is an "at-will employee"); *Stone v. Jo-Ann Stores, Inc.*, 109 F. Supp.2d 752, 755 (N.D. Ohio 2000) (holding that an offer letter which confirmed plaintiff's employment and stated his annual salary was "in no way a definite, 'unequivocal' expression" of defendant's intention to enter into an employment contract).  Petersen acknowledged that none of his offer letters provided for employment of a specific duration. (P. Dep. 71-72).  Rather, each agreement only identified the rate of pay that Petersen received for the academic year.  Therefore, because Petersen was an at will employee, his breach of contract claim fails as a matter of law.

### 2.  *CIA did not breach the alleged contracts' terms.*

Even if Petersen's offer letters are considered contracts, his claim still fails because CIA did not breach the terms of those contracts.  In order to prevail on a breach of contract claim, Petersen must demonstrate that CIA breached his contracts.  In any action alleging breach of an express or implied employment contract, the burden is on the party asserting the existence of an employment contract to prove each element of the contract.  *Sibley v. Alcan, Inc.*, No. 1:05-cv-

0550, 2007 U.S. Dist. LEXIS 22932, at *22 (N.D. Ohio Mar. 29, 2007).  To recover upon a breach of contract claim, a plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant and damage or loss to the plaintiff.  *Delay v. Rosenthal Collins Group*, No. 2:-07-cv-568, 2008 U.S. Dist. LEXIS 42032, at *18-19 (S.D. Ohio May 27, 2008).

Petersen's alleged employment contracts specified the number of hours to be worked per year, the period of time to be worked and the rate of pay for that time period.  (P. Dep. Exs. B,C,F,G ).  There are no terms in the alleged contracts regarding payment for overtime. (*Id.*).  Therefore, as a matter of law the fact that CIA did not pay Petersen overtime is not a breach of contract.  Furthermore, it is undisputed that Petersen received the annual contract amount, as amended, each year for the salary period identified in each contract.  (P. Dep. 311-12) Accordingly, because CIA paid Petersen in accordance with each of the alleged contracts, his breach of contract claim must fail.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, CIA respectfully requests that this Court grant its Motion for Summary Judgment.

Respectfully submitted,

*/s/ Lisa M. Jones*
T. Merritt Bumpass, Jr. (0015189)
mbumpass@frantzward.com
Rebecca J. Bennett (0069566)
rbennett@frantzward.com
Lisa M. Jones (0082426)
ljones@frantzward.com
FRANTZ WARD LLP
2500 Key Center, 127 Public Square
Cleveland, Ohio 44114-1230
(216) 515-1660 (Phone) ● (216) 515-1650 (Fax)

Attorneys for Defendant The Cleveland Institute of Art

20

## CERTIFICATE OF SERVICE

A copy of the foregoing Memorandum in Support of Defendant's Motion for Summary Judgments was filed electronically this 30th day of April 2009.  All parties will be served by operation of the Court's electronic filing system.


*/s/ Lisa M. Jones*
One of the Attorneys for Defendant