## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

| | | |
|---|---|---|
| **BRETON PETERSEN,** | ) | CASE NO. 1:08 CV 01217 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER |
| v. | ) | |
| | ) | **REPLY OF DEFENDANT THE** |
| THE CLEVELAND INSTITUTE OF ART, | ) | **CLEVELAND INSTITUTE OF ART IN** |
| | ) | **SUPPORT OF ITS MOTION FOR** |
| Defendant. | ) | **SUMMARY JUDGMENT** |

### INTRODUCTION

Pending before the Court are the Cross-Motions for Summary Judgment of Defendant The Cleveland Institute of Art ("CIA" or "Defendant") and Plaintiff Breton Petersen ("Petersen or "Plaintiff") and the parties' Opposition thereto. As explained below, while Petersen has attempted to minimize his responsibilities as a Technical Assistant ("TA") for CIA's CD and ID departments, the record evidence demonstrates that Petersen was an exempt employee under the Fair Labor Standards Act's ("FLSA") administrative and/or executive exemptions. Petersen has failed to provide record evidence or any direct authority showing that there remains any genuine issue of material fact in dispute.

For the reasons set forth below, as well as the undisputed facts and legal arguments set forth in CIA's Motion for Summary Judgment, Memorandum in Support and Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, that are incorporated by reference herein, CIA respectfully request that the Court enter summary judgment in its favor on each of Plaintiff's claims.

### ARGUMENT

**I. Mr. Scragg's 30(b)(6) Testimony Is Not a Judicial Admission.**

Petersen has repeatedly asserted that CIA is bound by Raymond Scragg's testimony in

which he stated that he believed that the TA position was non-exempt. According to Petersen, Mr. Scragg's testimony effectively precludes CIA from asserting any legal defense to this issue. Indeed, Petersen contends that he is entitled to summary judgment on the basis of Mr. Scragg's testimony, alone. Petersen's contention is incorrect. Mr. Scragg's testimony does not constitute a judicial admission that formally and finally decides this issue.

A 30(b)(6) witness does not bind his employer as to legal conclusions. The United States District Court for the Northern District of Ohio has stated that while an employer is bound by the deposition testimony of its corporate designee, such testimony does not constitute a judicial admission. *See Ruth v. A.O. Smith Corp.*, No. 1:04-CV-18912, 2006 U.S. Dist. LEXIS 7361, at * 30 (N.D. Ohio, Feb. 27, 2006); *see also Industrial Hard Chrome, Ltd., IHC v. Hetran, Inc.*, 92 F. Supp. 2d 786, 791 (N.D. Ill. 2000) (construing Fed. R. Civ. P. 30(b)(6)) (stating that "[w]hile [the corporations] are bound by the testimony given by their designated representative during the Rule 30(b)(6) deposition, such testimony is not a judicial admission that ultimately decides the issue. The testimony given at a Rule 30(b)(6) deposition is evidence, which, like any other deposition testimony, can be contradicted and used for impeachment purposes").

In *W.R. Grace & Co v. Viskase Corp.*, No. 90 C 5383, 1991 U.S. Dist. LEXIS 14651 (N.D. Ill., Oct. 15, 1991), the court stated:

> It is true that a corporation is "bound" by its Rule 30(b)(6) testimony, in the same sense that any individual deposed under Rule 30(b)(1) would be "bound" by his or her testimony. All this means is that the witness has committed to a position at a particular point in time. It does not mean that the witness has made a judicial admission that formally and finally decides an issue. Deposition testimony is simply evidence, nothing more. Evidence may be explained or contradicted.

Petersen has failed to cite any direct authority that establishes that a 30(b)(6) witness binds a company as to the law or legal conclusions. Instead, Petersen only cites cases that

2

address a 30(b)(6) witness's knowledge of the facts. *See* Petersen's Motion for Summary Judgment at p. 10-11. None of Petersen's cited cases remotely suggest that a corporation is bound by a 30(b)(6) witness's legal conclusions, as such a rule would convert 30(b)(6) testimony into judicial admissions.

At issue in this case is whether Petersen satisfies the requirements of the administrative and/or executive exemptions of the FLSA. While CIA acknowledges that it is bound by Mr. Scragg's testimony with respect to his statements of fact, it is not bound by his opinion that the TA position was non-exempt – a legal conclusion and the ultimate issue to be determined by the Court in this matter. Accordingly, Petersen's argument that Defendant is precluded from, and Petersen is entitled to, summary judgment on the basis of Mr. Scragg's deposition testimony is simply incorrect.

## II. Petersen's Job Duties Meet the Requirements of the Administrative and Executive Exemptions.

Despite Petersen's repeated attempts to minimize his duties, Petersen's responsibilities were far more significant than simply ordering paper and ink. Ironically, Petersen now attempts to minimize the importance of his duties, while maintaining that he was required to work extra hours from home and field inquiries about issues that his supervisors could not resolve. A review of the record evidence, including Petersen's own testimony and e-mail correspondence, indicates that Petersen satisfies the requirements of the administrative and executive exemptions. Specifically, the record evidence demonstrates that Petersen's duties including the following:

### Managing the Computer Labs

- Installing software programs in the computer labs (P. Dep. 110).
- Assisting students and faculty in the computer labs with printing projects (P. Dep. 36).
- Providing students with access to the computer server (P. Dep. 85).

3

- Printing large projects for students on CIA's large format printers (P. Dep. 95).

- Working with CIA vendors and suppliers to ensure that the labs were appropriately stocked to meet student demands (P. Dep. 147-48).

- Instructing students on how to use various pieces of equipments (P. Dep. 152).

- Setting up the computer labs at the beginning of each school year (P. Dep. 155)

- Imaging the computers in the labs at the beginning of each school year (P. Dep. 155-56).

- Recommending that the computer lab rules be revised in the CD department (P. Dep. 165)

- Revising the computer lab rules in the CD department (P. Dep. 165).

- Researching and setting up new print tracking software for the ID Department, which Petersen described as complicated and time consuming (Defendant's Memorandum in Support of Motion for Summary Judgment, Exhibit D, at D 0150).

- Creating disk images (Exhibit A, at 275).[1]

- Creating department videos showcasing student projects (P. Dep. 152).

### Resolving Technology-Related Problems

- Assisting students with resolving software problems on their laptop computers (P. Dep. 108).

- Resolving printer problems (P. Dep. 120).

- Resolving emergency computer problems, including addressing issues when the ID server crashed (P. Dep. 127-28).

- Troubleshooting computer network issues (P. Dep. 147).

- Troubleshooting configuration problems for Mac and PC computers (Exhibit B, at D 0134).[2]

- Maintaining computer equipment to ensure that it is working properly (P. Dep. 148).

- Fixing software (P. Dep. 158-159).

### Supervising Work Study Students

- Tracking and calculating the hours worked for 14 work study students, including completing and signing their time cards as their supervisor (P. Dep. 125; Defendant's Memorandum in Support of Motion for Summary Judgment, at Exhibit E).

---

[1] Attached hereto as Exhibit A are documents produced by Petersen in discovery.
[2] Attached hereto as Exhibit B are documents produced by Defendant in discovery.

- Assigning work to 14 work study students (P. Dep. 126).

- Teaching work study students how to handle basic printing duties (Exhibit B, at D 0114).

### Recommending Purchases & Accounting for Student Fees

- Tracking and calculating students' printing fees (P. Dep. 111-12).

- Making recommendations with respect to capital requests for the departments (P. Dep. 149).

- Making recommendations with respect to the purchase of print tracking software (P. Dep. 171; Exhibit B, at D 0145).

- Managing the accounts, fees and bills for the new print tracking software (Exhibit A, at 254).

- Finalizing bills and establishing payments for students with respect to their printing fees (Exhibit A, at 177, 185).

**A. Petersen is Exempt under the Administrative Exemption.**

Petersen now contends that the direct authority cited in Defendant's Memorandum in Support of Summary Judgment is inapposite to this case because Petersen was not the sole individual in the computer department responsible for the computer network and "all complicated tasks" were handled by CIA's IT department. As an initial matter, it was of absolutely no consequence to the Court in *Koppinger v. American Interiors, Inc.*, 295 F. Supp.2d 797 (N.D. Ohio 2003) that the plaintiff was the sole individual responsible for the computer network. The fact that Petersen had an IT department to assist him in completing his duties does not detract from the importance of his duties and their impact on CIA.

It also is ironic that Petersen now attempts to distinguish himself and his duties from those of CIA's IT department. In negotiating for a higher salary with CIA, Petersen described himself as a "very capable IT person" (Exhibit B, at D 0114), and noted that he had the same job description as other IT related personnel who:

> [m]aintain[], analyze[], troubleshoot[], and repair[] computers systems, hardware and computer peripherals. Document[],

5

> maintain[], upgrade[] or replace[] hardware and software systems. Support[] and maintain[] user account information, including rights, security and systems groups.

(Exhibit B, at D 0134). As evidenced by Petersen's own email, he believed he was responsible for the very types of duties that were held to meet the requirements of the administrative exemption in *Koppinger* and *Lutz v. Ameritech Corp.*, No. 98-2367, 2000 U.S. App. LEXIS 3218 (6th Cir. Feb. 23, 2003). Petersen cannot now assert that all of the more complicated duties were completed by another department, when he had previously held himself out as completing these same duties and therefore, required a higher salary. Also, it should be noted that while Petersen maintains that IT provided him with the image to "image" the computer labs, he previously discussed the necessity of having to create a disk image to resolve a computer problem. (Exhibit A, at 275).

Furthermore, in attempting to distinguish CIA's direct authority, Petersen fails to acknowledge that many of Petersen's duties mirror the duties of the plaintiffs in *Koppinger* and *Lutz*, which were held to satisfy the administrative exemption. In particular, those plaintiffs were responsible for implementing new programs, resolving network problems, recommending purchases of new software and hardware, installing software, and repairing equipment. Here, Petersen testified that he had the same or similar responsibilities: (1) Petersen installed software programs (P. Dep. 110); (2) Petersen resolved network and computer configuration problems (P. Dep. 147; Exhibit B, at D 0134); (3) Petersen made recommendations with respect to purchases of new software and hardware (P. Dep. 149, 171); and (4) Petersen maintained and repaired equipment (P. Dep. 127-128). While Petersen may now wish to describe these tasks as menial, the fact remains that these duties have been held to meet the administrative exemption requirements.

In furtherance of his attempt to minimize his duties, Petersen completely ignores his role in making recommendations with respect to purchases for the ID and CD departments. In particular, Petersen was the driving force behind CIA's purchase of the print tracking software, P-Counter. (P. Dep. 171). On his own initiative, Petersen independently researched the use of the P-Counter software. As a result of his research, Petersen recommended the purchase of the software, which was approved by his supervisors, and took all of the initiative in preparing it for use in the labs. (Exhibit B, at D 0145). Petersen explained that he wanted CIA to use P-Counter because he wanted to help CIA manage print costs and improve printing efficiency – items that were directly related to the management and general operations of the CIA. (*Id.*). Petersen's research and recommendation of the P-Counter program is just one example of his exercise of discretion and independent judgment with respect to a significant purchase for the CD and ID departments.

Petersen also attempts to discount the magnitude of his duties by suggesting that using the internet to research how to resolve computer problems did not constitute an exercise of discretion and independent judgment. Looking to various source materials for some of the technical information and using a computer to aid research and recommendations does not detract from the import of the discretion and independent judgment exercised. *Renfro v. Indiana Michigan Powers Co.*, 497 F.3d 573, 577 (6th Cir. 2007); *see also Austin v. Cuna Mutual Ins. Soc'y*, 240 F.R.D. 420 (W.D. Wis. 2006) (noting that an employee, who utilized internet research to accomplish various job duties, satisfied the requirements of the administrative exemption).

The record evidence demonstrates that Petersen routinely exercised discretion and independent judgment. In addition to independently researching and recommending the purchase of the P-Counter software, Petersen also suggested and revised the computer lab rules

7

in the CD department. (P. Dep. 165.) Petersen also testified that he rarely received instruction on how to perform his job duties. (P. Dep. 37-38). Instead, Petersen testified that he relied on his previous work experience and his own independent research to perform his job duties and resolve problems. (*Id.*). Similar to the plaintiff in *Lacourse v. GRS III, LLC*, 2006 U.S. Dist. LEXIS 899355 (E.D. Mich. Dec. 13, 2006), no one instructed Petersen as to what issues to research or how. Rather, his supervisors entrusted him with the responsibility of solving the computer problems on his own. For example, Dan Cuffaro, one of Petersen's supervisors, turned to him to resolve a computer problem for a student. In an email to Petersen, Mr. Cuffaro wrote the following:

> Rebecca is still having Indesign problems, are you aware of any software issues or fixes, or do you know of anyone else that can help?

(Exhibit B, at D 0191).

The record evidence also demonstrates that Petersen's resolution of problems related to matters of significance for both CIA and its customers – the students. The students in the CD and ID labs depended on Petersen to ensure that the lab was properly working in order for them to timely complete their projects. (*See* Exhibit B, at D 0143, D 0159, D 0161, D 0166). The students frequently turned to Petersen whenever anything in the computer labs went wrong. For example, the ID students depended on the use of the ID server on a daily basis. When the ID server crashed, the students automatically turned to Petersen, as indicated in the text of the emails below:

> The IDNET server is down AGAIN today, it was down yesterday, and it was down all day last Sunday. This needs to be fixed ASAP, we cannot login to our accounts in the mac lab, and we cannot do ANYTHING in the Alias lab without IDNET access. This is a serious problem, as it limits what work we can do over the weekends. Please take care of this.

8

> It is past noon, IDNET has been down all morning, an no one has been in to fix it. I NEED to work in Alias, and I am not the only one. PLEASE FIX THIS NOW!

(Exhibit B, at D 0161, D 0166). This student's emails to Petersen particularly emphasize the significance of Petersen's responsibilities in maintaining the ID server, which was crucial to the ID students' academic success.

Petersen's duties were also significant because they were directly related to a student's ability to graduate. In particular, one of Petersen's duties required him to manage student printing fees and accounts. (Exhibit A, at 177, 185). This duty was vital to both CIA and the students as Petersen's timely completion of the final bills determined whether students would be financially eligible to graduate on time. In an e-mail, Petersen's supervisor, Mari Hulick, underscored the importance of this responsibility:

> I just got wind that students have not been billed for printing. This needed to be done before BFAs [Bachelor of Fine Arts degrees]. Please go over the billing process and set payments for students, we need this done for Monday, as both grades and graduation may be held up without the final bills being paid.

(Exhibit A, at 177). Petersen's failure to complete his duties could lead to a delay in a student's graduation. Petersen cannot argue that a student's graduation is not a matter of great significance to both the student and CIA.

As demonstrated herein, and in Defendant's Motion for Summary Judgment, Memorandum in Support and Opposition to Plaintiff's Motion for Summary judgment, Petersen's job duties plainly satisfy the requirements of the administrative exemption. The record evidence further demonstrates that Petersen exercised discretion and independent judgment with respect to matters of significance. Accordingly, Defendant should be granted summary judgment on Plaintiff's claims.

### B. Petersen is Exempt under the Executive Exemption.

In Defendant's Memorandum in Support of its Motion for Summary Judgment, CIA also established that Petersen satisfied the requirements of the executive exemption. Petersen contends that he does not meet the requirements of the exemption because Petersen did not supervise two or more employees for 80 hours. It must be noted, however, that Petersen offers no direct authority to support his contention that an individual is required to supervise 80 hours in order to satisfy the requirements of the executive exemption. The regulation provides, in pertinent part:

> To qualify as an exempt executive under § 541.199, the employee must customarily and regularly direct the work of two or more other employees. The phrase "two or more other employees" means two full-time employees or their equivalent. One full-time and two half-time employees, for example, are equivalent to two-full time employees. Four half-time employees are also equivalent.

29 C.F.R. § 541.104(a).

The regulations do not define "full time." The Department of Labor has declined to clarify the meaning of full time, and the United States Court of Appeals for the Sixth Circuit has not addressed the issue. As a result, there is no direct authority that defines full time and there is certainly no direct authority to support Petersen's contention that an individual must supervise two employees for at least 80 hours in order to satisfy the executive exemption. Accordingly, CIA urges this Court to adopt the plain meaning of the statute. *See Marshall v. Hendersonville Bowling Ctr. Inc.*, 672 F.2d 917 (6th Cir. 1981) (holding that 2 bowling alley managers, who supervised two part-time high school students, satisfied the executive exemption).

It is undisputed that Petersen regularly supervised two or more employees. Indeed, Petersen supervised a total of 14 work study students for an average of approximately 22 hours

10

per week over the course of the 2006-2007 and 2007-2008 academic years. (*See* Defendant's Memorandum in Support of Summary Judgment, at Exhibit E). Petersen testified that he assigned work to these work-study students and instructed them on certain printing procedures. (*See* P. Dep. 126; Exhibit B at D 0114). Petersen also signed their time cards acknowledging that he was their direct supervisor. (*See* Defendant's Memorandum in Support of Summary Judgment, at Exhibit E). Under the plain meaning of the statute, the record evidence demonstrates that Petersen satisfies the executive exemption with respect to his supervision of two or more employees.

Petersen also now alleges that he did not direct and plan the work of the work study students. Plaintiff's contention is contrary to the record evidence. Indeed, with no direction or instruction from his supervisors, Plaintiff explained, in an email, his duties as a TA for both the CD and ID departments:

> All jobs are incorporated into a new job, **where I can supervise work-study students to handle some of the more basic (but time consuming for me) duties. Printing is the major time consumer for both jobs, and it's something I can teach work-study students how to do while supervising them throughout the year…the school would save a lot of money by creating a new position that oversees and delegates work to work-study students. Since both CD and ID already employ work-study students, this makes a lot of sense.**

(Exhibit B, at D 0114) (emphasis added). As evidenced in his email, Petersen did not receive instruction from his supervisors as to how to direct the work-study students. Petersen directed their work on his own initiative. Accordingly, his contention that he did not direct and plan the work of work study students is incorrect and belied by his own words.

With respect to his other management responsibilities, Plaintiff again attempts to minimize his duties. With respect to ordering supplies, no one told Petersen how much to order

11

and when to place orders. Petersen had to make these decisions based on the students' needs at any given time. Petersen also had to ensure that he ordered enough supplies in advance to accommodate all of the students' special projects. In addition, Petersen testified that he was responsible for the day to day operations of the computer labs. (P. Dep. 147). A review of the record evidence shows that Petersen was responsible for management of the computer labs.

Finally, Plaintiff contends that he did not hire work study students. Again, Plaintiff's most recent contention is contrary to the record evidence. Petersen testified that he hired work-study students who applied to work in the ID department. (P. Dep. 249-50). Thus, Petersen had the authority to hire work study students, and as a result, satisfies the requirements of the executive exemption.

Accordingly, because CIA has established that Petersen satisfies the administrative and executive exemptions, his wage and hour claims should be dismissed as a matter of law.

**III. Petersen Was an At-Will Employee.**

Petersen attempts to maintain his breach of contract claim on the basis of his erroneous conclusion that his offer letters from the CIA constituted express contracts of employment. In making this assertion, Petersen ignores all evidence and case law that indicates that he was an at will employee. Specifically, Petersen ignores the fact that his offer letters did not specify the duration of his employment, and he signed an acknowledgment that clearly indicated he was an at will employee. Petersen does not address the fact that he signed an acknowledgment, and instead, he maintains that his offer letters were contracts because they provided for a fixed amount of compensation for a specific period of time. Petersen's argument is misplaced.

    **A. Petersen's Offer Letters Did Not Specify Duration of Employment.**

Under Ohio law, an employment contract that provides for an annual rate of

compensation, but makes no provision as to the duration of the employment, is a contract terminable at will by either party. *Henkel v. Educational Research Council of America*, 45 Ohio St.2d 249, syllabus (1976). Ohio courts have routinely stated that the "mere stating of an annual salary *does not* create a contract for a term of one year." *Pond v. Devon Hotels, Ltd.*, 55 Ohio App. 3d 260, 274 (10th Dist. 1988) (citing *Henkel*, 45 Ohio St. 2d 249, at syllabus). *See also Kane v. Mazer Corp.*, 2nd Dist. No. 13550, 1993 Ohio App. LEXIS 2479, at *6 (May 14, 1993)(the employment relationship is at will "where the contract of hiring specifies no term of duration but fixes compensation at a certain amount per day, week, or month").

For example, in *Springer v. Physician Sales & Serv.*, Montgomery App. No. 16940, 1998 Ohio App. LEXIS 3930 (Aug. 28, 1998), the plaintiff's offer letter provided for a fixed amount of compensation for a specific period of time (6 months). *Id.* at *1-2. The court held that the offer letter did not guarantee employment for any fixed period of time; it merely provided for a fixed amount of compensation during the employee's first six months of employment. *Id.* at *5. Accordingly, the Court held that the plaintiff was an at-will employee. *Id.*

Similarly, in *Gill v. Monetary Mgmt. Corp.*, Cuyahoga App. No. 69949, 1996 Ohio App. LEXIS 4088 (Sept. 19, 1996), the plaintiff alleged that his offer letter constituted an express written contract because it described various terms of his employment. The court held, however, that the plaintiff was an at will employee because the offer letter did not specify the tenure or duration of employment. *Id.* at *7-8 (citing *Lowry-Greene v. Brighton Hotel Corp.*, Cuyahoga App. No. 60838, 1992 Ohio App. LEXIS 4212 (Aug. 20, 1992) (absent statement regarding duration of employment, a letter that summarized the employee's salary, signing bonus, insurance, automobile allowance, vacation schedule and expenses did not constitute an implied contract of employment).

Petersen's offer letters did not guarantee employment for a fixed period of time. Rather, each offer letter only provided for a fixed amount of compensation for a specific period of time. An employment letter that only provides compensation for a fixed period of time is not an employment contract. Accordingly, Petersen did not have contracts of employment with CIA, and therefore, his breach of contract claim must fail as a matter of law.

### B. Petersen Acknowledged His At Will Employment Status.

Petersen's breach of contract claim also must fail because he specifically acknowledged his employment at-will status. Ohio courts have routinely recognized that an employee who signs an at-will acknowledgment clearly indicates his understanding of his at-will employee status. For example, in *Kane v. Mazer Corp.*, the plaintiff contended that he had an express contract for employment on the basis of his employer's offer letter, which summarized his compensation, and a memorandum of compensation signed by both parties, creating a growth fund for the employee's benefit. *Id.* at *8. The court noted that the employment letter did not rebut the presumption of at-will employment. *Id.* at *11. In determining that the employment relationship was at-will, the court relied on the fact that the plaintiff has signed two documents acknowledging that his employment was at will. *Id.* at *3, *10. The Court held that by signing the documents, the plaintiff acknowledged and consented to the at will nature of his employment. *Id.* at *11; *see also Physician Sales & Serv.*, 1998 Ohio App. LEXIS 3930, at *5 (noting that an employee who signed an acknowledgment of his at will status when he was hired, clearly indicated his understanding that he was an employee at will).

It is undisputed that Petersen signed an acknowledgment of his at will employment status. (P. Dep. Ex. J). Petersen's signed acknowledgment is evidence of his clear understanding that he was an at will employee, and he has offered no evidence to the contrary. Accordingly, because

the record evidence unequivocally demonstrates that Petersen was an at will employee, his breach of contract claim must fail as a matter of law.

### C. Petersen Was Paid Pursuant to the Offer Letters.

Even if the Court determines that Petersen's offer letters were contracts of employment, Petersen's breach of contract claim still fails. In order to determine the terms of a contract, the court must look at the four corners of the agreement. *See Chan v. Miami Univ.*, 73 Ohio St. 3d 52, 57 (1995). In this instance, each offer letter provided for a specific amount of compensation for a specific period of time. (*See* P. Dep. Exs. B,C,F,G). It is undisputed that Petersen received the annual contract amount each year for the salary period identified in each contract. (P. Dep. 311-12). Therefore, because CIA paid Petersen in accordance with the terms of each of the alleged contracts, his breach of contract claim must fail.

Petersen maintains, however, that CIA breached the contract because it failed to pay him for hours he allegedly worked outside of the requirements in the contract. The offer letters make no provision for extra payments or overtime. (*See* P. Dep. Exs. B,C,F,G). Therefore, CIA was under no contractual obligation to pay Petersen any additional compensation. Finally, it should be noted that if Petersen's contention is correct and the offer letters were a contract requiring him to be paid an hourly rate for all hours worked, Petersen is liable to CIA for the many weeks in which he did not work the required number of hours specified in the contract.

### CONCLUSION

For the foregoing reasons, as well as the arguments set forth in Defendant's Motion for Summary Judgment, Memorandum in Support, and Opposition to Petersen's Motion for Summary Judgment, Defendant CIA respectfully requests that the Court enter judgment in its favor as to all of Petersen's claims.

Respectfully submitted,

/s/ *Lisa M. Jones*
T. Merritt Bumpass, Jr. (0015189)
mbumpass@frantzward.com
Rebecca J. Bennett (0069566)
rbennett@frantzward.com
Lisa M. Jones (0082426)
ljones@frantzward.com
FRANTZ WARD LLP
2500 Key Center, 127 Public Square
Cleveland, Ohio 44114-1230
(216) 515-1660 (Phone) ● (216) 515-1650 (Fax)
Attorneys for Defendant The Cleveland Institute of Art

## CERTIFICATE OF SERVICE

A copy of the foregoing Memorandum in Opposition to Petersen's Motion for Summary Judgment was filed electronically this 9th day of July, 2009. All parties will be served by operation of the Court's electronic filing system.

/s/ *Lisa M. Jones*
One of the Attorneys for Defendant